### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| **CAROLYN FREEMAN**, <br><br> *Petitioner-Plaintiff*, <br> v. <br><br> **TIMETHEA PULLEN**, Warden of Federal Correctional Institution Danbury, in her official capacity, <br><br> **PATRICK MCFARLAND**, Residential Reentry Manager, in his official capacity, and <br><br> **COLETTE S. PETERS**, Director, Federal Bureau of Prisons, in her official capacity, <br><br> *Respondents-Defendants.* | Civil Action No. 22-1567 <br><br><br> **PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241, REQUEST FOR IMMEDIATE ORDER OF ENLARGEMENT & COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> December 9, 2022 |

### PRELIMINARY STATEMENT

1.      Petitioner-Plaintiff Carolyn Freeman is a 33-year-old mother who spent nine months on home confinement caring for her 12-year-old daughter and working full-time at a hospital caring for suicidal patients. Despite her hard work and progress towards reintegration into the community, the Federal Bureau of Prisons ("BOP"), through Respondents-Defendants, re-imprisoned Ms. Freeman based on a single set of breathalyzer tests which indicated alcohol consumption. As a result, Ms. Freeman's daughter is without the crucial care and stability her mother was providing her and has bounced around among family members unable to give her the support that she needs. The BOP took the drastic action of re-imprisoning Ms. Freeman without first providing her with a fair hearing in front of a neutral decisionmaker, where she could assert that the allegations against her did not warrant upending the life she had been endeavoring to

rebuild, separating her from her young daughter, and severing the community ties she had been working to reestablish.

2.      Respondents-Defendants' re-imprisonment of Ms. Freeman violates her due process rights. Before incarcerating her and separating her from her family, Respondents-Defendants did not, *inter alia*: inform Ms. Freeman that she faced re-imprisonment; provide her the assistance of counsel; disclose to her the evidence underlying her charge; and provide her with an opportunity to present evidence and confront witnesses at a hearing before a neutral and detached decisionmaker.

3.      Ms. Freeman petitions this Court for a Writ of Habeas Corpus to remedy her unlawful imprisonment and seeks an order of enlargement pending a decision on the underlying petition. She also seeks declaratory and injunctive relief.

## PARTIES

4.      Petitioner-Plaintiff Carolyn Freeman is a 33-year-old mother who spent her time on home confinement working full-time at a hospital and serving as the primary caregiver for her 12-year-old daughter. Ms. Freeman is currently imprisoned at the Federal Correctional Institution Danbury ("FCI Danbury") and is in custody of the BOP.

5.      Respondent-Defendant Timethea Pullen is the Warden at FCI Danbury. She is the immediate custodian of Ms. Freeman. She is sued in her official capacity.

6.      Respondent-Defendant Patrick McFarland is a Regional Reentry Manager at the BOP's New York Residential Reentry Management (RRM) field office. On information and belief, he is the BOP official who determines whether individuals supervised by the New York RRM will be returned to prison for alleged violations while on home confinement and who notifies the U.S. Marshals to detain individuals and remand them to prison. He is sued in his official capacity.

7. Respondent-Defendant Colette S. Peters is the Director of the BOP. She has ultimate authority over the decision to confine Ms. Freeman and over the conditions and location of that confinement. She is sued in her official capacity.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to Article I, § 9, cl. 2 of the U.S. Constitution; the Fifth and Eighth Amendments of the U.S. Constitution; and 28 U.S.C. §§ 1331, 1346, 1651, 2201-2202, and 2241.

9. Venue is proper in the District of Connecticut because Petitioner-Plaintiff is physically present in the District of Connecticut and is in the custody of the Respondents-Defendants in this district. 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

**Ms. Freeman's Release to Home Confinement**

10. Ms. Freeman was released on home confinement from December 2020 to September 2021. During that time, she worked full-time at a hospital and served as the primary caregiver for her 12-year-old daughter.

11. Home confinement is a program of the BOP whereby individuals serving a federal sentence are released from prison before the expiration of their imposed sentences of imprisonment. *See* 18 U.S.C. § 3624(c)(2). Individuals on home confinement remain technically in BOP custody but are allowed to live at home with their families, seek and maintain employment, pursue educational opportunities, participate in treatment programs, attend religious services, and engage in various other activities in their communities. Home confinement is intended to "afford [a] prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." *Id.* § 3624(c)(1).

12.     On March 27, 2020, due to the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (2020), which expanded the authority of the BOP to place individuals on home confinement under 18 U.S.C. § 3624(c)(2)—previously capped at the shorter of 10% of their sentence or 6 months—provided that the Attorney General makes a finding that "emergency conditions will materially affect the functioning of the Bureau." Attorney General Barr made that finding on April 3, 2020, issuing a memo indicating that the BOP was "experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton." Noting the Bureau's "profound obligation to protect the health and safety of all inmates," Attorney General Barr directed the BOP to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions."[1]

13.     At the start of the COVID-19 pandemic, Ms. Freeman was serving a sentence for a non-violent drug offense at the minimum-security women's Camp at FCI Danbury. This was Ms. Freeman's first and only prison sentence; she has no prior convictions. Ms. Freeman was on pretrial release prior to sentencing and complied with the conditions of her release. After Ms. Freeman's sentencing in 2018, her daughter (then age 7) went to live with Ms. Freeman's mother and father. *See* Declaration of Carolyn Freeman ¶ 3 ("C. Freeman Decl.") (attached hereto as Exhibit 1). During her incarceration, Ms. Freeman stayed in close contact with her daughter through phone calls. In addition, before the pandemic began, Ms. Freeman's mother brought her daughter to see her at FCI Danbury a number of times. *Id.* ¶ 5.

---

[1]     Office of the Attorney General, *Memorandum for Director of Bureau of Prisons* (April 3, 2020), https://www.justice.gov/file/1266661/download.

14.     Based on various factors, including Ms. Freeman's participation in programming and her lack of criminal history, the BOP scored her as having a "Minimum" recidivism risk, the lowest possible level under BOP's risk assessment system. *See* BOP Risk Assessment (attached hereto as Exhibit 2). While incarcerated, Ms. Freeman worked in various departments, including laundry, food service, plumbing, and construction. In addition to completing courses relating to business, budgeting, and financial responsibility, Ms. Freeman studied medical coding. Ex. 1, C. Freeman Decl. ¶ 4.

15.     Because of the dangers of the pandemic and Ms. Freeman's low public safety risk, the BOP released Ms. Freeman from FCI Danbury to home confinement in December 2020 under the CARES Act.[2] *Id.* ¶ 2.

**Ms. Freeman's Time on Home Confinement**

16.     While on home confinement, Ms. Freeman was supervised by a halfway house run by the Kintock Group in Newark, New Jersey. The Kintock Group contracts with the BOP to provide supervision to individuals placed on home confinement in the area. During this time, Ms. Freeman was required to report to the halfway house approximately three times per month. Staff routinely administered breathalyzer and drug tests. *Id.* ¶ 12.

17.     When Ms. Freeman was released on home confinement, she reunited with her daughter, who was then age 10. Ms. Freeman and her daughter initially stayed with Ms. Freeman's parents. Her parents were going through a separation at the time, and Ms. Freeman and her daughter

---

[2]     Ms. Freeman was released on home confinement from FCI Danbury under the CARES Act pursuant to a settlement agreement entered following the issuance of a temporary restraining order requiring the BOP to undertake expedited consideration for home confinement of individuals at higher risk for severe illness from COVID. *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350 (D. Conn. May 12, 2020).

soon moved out to a friend's apartment, where they resided until the BOP re-imprisoned Ms. Freeman in September 2021. *Id.* ¶ 6.

18.     While on home confinement, Ms. Freeman was her daughter's primary caregiver and lived with her full-time. When Ms. Freeman first got home, her daughter's school was still closed because of COVID. Because Ms. Freeman had not yet secured employment, and her daughter's school had gone remote, the two of them would spend every day together. Ms. Freeman gave her daughter breakfast each morning and got her ready for her remote schooling. Ms. Freeman made sure her daughter paid attention during her online lessons and helped her with her homework. *Id.* ¶ 7.

19.     Carolyn got her daughter enrolled in a charter school in Newark. Later in the school year, after in-person school resumed and Ms. Freeman secured her position at the hospital, Ms. Freeman would—before heading to work herself—give her daughter breakfast, help her do her hair, and get her dressed in her uniform, so that she would be ready each day for the bus to school. At this time, Ms. Freeman was living with her daughter at her friend's house. Her friend has a daughter a few years older than Ms. Freeman's daughter, and the girls got along well. Ms. Freeman and her friend took turns cooking for the household. Ms. Freeman's daughter loves to dance, and she was always dancing around the apartment—asking her mother to make videos of her dancing and even to join her. *Id.* ¶¶ 8-9. In other words, Ms. Freeman and her daughter were "reconnecting, making up for lost time." Declaration of Star McQueen ¶ 6 ("McQueen Decl.") (attached hereto as Exhibit 3). Carolyn's daughter was doing really well at this time and getting good grades in school. *Id.* ¶ 6.

20.     In addition to caring for her daughter, Ms. Freeman obtained a full-time position at a hospital. She worked in patient care safety, and her responsibilities included monitoring suicidal and other at-risk patients. Her shift was 7am to 3:30pm, and she frequently worked overtime on her

days off. Ms. Freeman took pride in obtaining this position and found caring for patients rewarding. She was making a good income and was well liked at work. Ex. 1, C. Freeman Decl. ¶ 10; Ex. 3, McQueen Decl. ¶ 6. At the time she was re-imprisoned, she was scheduled to begin classes the next month to become a patient care technician. She had already made arrangements for financial aid and enrolled in a program at a local college. Her long-term goal is to become a nurse. Ex. 1, C. Freeman Decl. ¶ 10.

21.    Prior to September 4, 2021, Ms. Freeman had not received an incident report while on home confinement. *Id.* ¶ 13.

**Disciplinary Action Against Ms. Freeman**

22.    On September 4, 2021, Kintock staff instructed Ms. Freeman to report to the halfway house, where she was subject to random breathalyzer and drug tests. *Id.* ¶ 14.

23.    Kintock staff issued an incident report to Ms. Freeman that day, charging her with a violation of Code 112 of the BOP's Inmate Discipline Program,[3] which prohibits "[u]se of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff." The incident report stated that a breathalyzer test administered that day indicated a BAC of .116. According to the report, a second test, administered approximately ten minutes later, yielded a BAC of .113. *Id.* ¶ 15.

24.    Kintock staff spoke with Ms. Freeman regarding the incident and permitted her to return home that day. *Id.* ¶ 16.

25.    On September 7, 2021, Kintock staff called Ms. Freeman to discuss the incident. Staff informed her that they were recommending to BOP that she lose 41 days of "good time

---

[3]    A list of conduct that can result in disciplinary sanctions by BOP is set forth in 28 C.F.R. § 541.3 ("Prohibited acts and available sanctions"). BOP Program Statement 5270.09 further describes the BOP's Inmate Discipline Program. *See* https://www.bop.gov/policy/progstat/5270_009.pdf.

credit"—the credit an individual earns toward shortening one's federal sentence. Staff did not inform Ms. Freeman that she was facing the possibility of going back to prison. *Id.* ¶ 17.

26.     For the next two weeks, Ms. Freeman was permitted to live at home, go to work, and go to the gym. On or around September 20, Kintock staff called Ms. Freeman and told her to report to the halfway house and bring spare clothes. Ms. Freeman followed staff instructions and reported that day. Ms. Freeman was under the impression that she was going to be required to live at the halfway house for a period of time. Staff did not warn her she was being re-imprisoned. *Id.* ¶¶ 18-19.

27.     Ms. Freeman spent the night in the halfway house, still unaware she was returning to prison. The next morning, staff told Ms. Freeman that the U.S. Marshals were there to take her into custody. The U.S. Marshals brought Ms. Freeman to a local jail. *Id.* ¶¶ 20-21.

28.     Ms. Freeman was not given the chance to tell her daughter that she was being re-imprisoned. She also did not have the opportunity to tell her supervisor at the hospital where she worked. *Id.* ¶ 20.

29.     On September 28, 2021, the BOP's Disciplinary Hearing Officer ("DHO") determined that Ms. Freeman was guilty of violating Code 112 and that her sanction would be 41 days loss of good time credit. The DHO decision did not indicate that a sanction of re-imprisonment should be imposed. *Id.* ¶ 24.

30.     Ms. Freeman never appeared in front of the DHO or any BOP official before being re-imprisoned. *Id.* ¶ 22.

31.     Ms. Freeman was not provided the evidence underlying her incident report before she was re-imprisoned. She did not receive a hearing before neutral decisionmakers and was therefore unable to present before the decisionmaker witnesses or evidence in support of remaining

8

on home confinement or to cross-examine adverse witnesses. Ms. Freeman also did not receive a written statement as to the decision to revoke her home confinement, the evidence relied upon in reaching the decision, and the reasons for revoking home confinement. *Id.* ¶ 23.

32.    Ms. Freeman's conversations with Kintock staff fell far short of a hearing before a neutral and detached decisionmaker.

**The Impact of Ms. Freeman's s Re-Imprisonment**

33.    After spending around a month in a local jail in New Jersey, Ms. Freeman was transferred to MDC Brooklyn. After another month, the BOP transferred Ms. Freeman to FCI Danbury, where she has been incarcerated ever since. *Id.* ¶ 21.

34.    When she was re-imprisoned, the BOP did not tell Ms. Freeman how long she would have to remain in prison. *Id.* ¶ 22.

35.    Since Ms. Freeman has been back in prison, she has not had the opportunity to appear before any BOP official to explain the incident and why she should not be in prison. *Id.* ¶ 22.

36.    Ms. Freeman's projected release date, according to the BOP's website, is March 1, 2024.

37.    Although Ms. Freeman is eligible for placement in the minimum-security women's Camp at FCI Danbury, she is currently housed in the low-security women's facility at FCI Danbury so that she can participate in the Residential Drug Abuse Program ("RDAP"). *Id.* ¶ 21.

38.    Ms. Freeman's 12-year-old daughter has been forced to live in four different households since her mother's re-imprisonment. *Id.* ¶¶ 25-20.

39.    When Ms. Freeman was first re-imprisoned in September 2021, her daughter initially continued to live with Ms. Freeman's friend. With her mother gone, however, Ms.

Freeman's daughter did not receive the care she needed. She went then to live with Ms. Freeman's mother and younger sister. By this time, Ms. Freeman's parents had separated and her father had moved away. *Id.* ¶¶ 25-26; Ex. 3, McQueen Decl. ¶ 9; Declaration of Lateefah Freeman ¶ 3 ("L. Freeman Decl.") (attached hereto as Exhibit 4). .

40.     Several months later, in January 2022, the grandmother suffered a massive stroke, which left her unable to speak or walk. Ms. Freeman's daughter witnessed the stroke. As she was getting ready for school one morning, she went into her grandmother's room to ask her a question. Her grandmother looked at her but could not speak normally. In addition to appearing confused and slurring her words, her face then began to droop on one side and she started noticeably drooling. Ms. Freeman's younger sister called an ambulance and Ms. Freeman's aunt for help. When the ambulance failed to promptly arrive, Ms. Freeman's aunt brought the grandmother (her sister) to the hospital. By then, the stroke had progressed to the point that she could not walk or speak. To date, her grandmother has not substantially recovered and remains largely paralyzed, unable to walk or speak. Ex. 1, C. Freeman Decl. ¶ 26; Ex. 4, L. Freeman Decl. ¶ 5.

41.     Witnessing her grandmother suffer a stroke was and continues to be a traumatizing event for Ms. Freeman's daughter. Ms. Freeman's daughter had a close relationship and bond with her grandmother, who served as her primary caregiver during Ms. Freeman's initial incarceration and in the months following Ms. Freeman's re-imprisonment. Ex. 1, C. Freeman Decl. ¶ 27.

42.     Following the stroke, Ms. Freeman's mother went to live with her sister. For a while, Ms. Freeman's daughter shuttled back and forth between the aunt's home and her father's home. Ms. Freeman's daughter had never lived with her father previously it took him some time to agree to have his daughter stay with him. He is in his 50s, and much older than Carolyn. Ex. 1, C. Freeman Decl. ¶¶ 28-29; Ex. 3, McQueen Decl. ¶¶ 10-11..

43.    Ultimately, it became clear that the aunt was unable to care for Ms. Freeman's daughter along with her debilitated sister and her own children. As a result, Ms. Freeman's daughter was sent to live with her father full time. Her father lives with his male cousin, who is around the same age as him. Also at the residence are the cousin's teenage twin boys, who both suffer from autism and whose mother passed away. Currently, Ms. Freeman's daughter lives in this crowded home where she has no private space and sleeps in the living room. She is twelve years old and going through a lot of changes at this age. It is a hard time to be living without female companionship and support. Although the twins are older than she is, she is expected to babysit for them and do chores in the house. Ex. 1, C. Freeman Decl. ¶ 29; Ex. 3, McQueen Decl. ¶¶ 11-12; Ex. 4, L. Freeman Decl. ¶¶ 6-8.

44.    Ms. Freeman's daughter is rarely provided with an opportunity to visit her mother's side of the family, as her father is usually unwilling to drive her to visit them or to pick her up from visits. This has exacerbated her feelings of isolation and alienation. Ex. 3, McQueen Decl. ¶ 16.

45.    Ms. Freeman's daughter frequently expresses how much she misses her mother, who was a stable source of support. Ms. Freeman communicates with her daughter by telephone everyday but has not seen her daughter in person since her re-imprisonment. Ex. 1, C. Freeman Decl. ¶ 30; Ex. 3, McQueen Decl. ¶ 14. She talks to her mother's cousin a lot, and to the cousin's daughter. She tells them she is unhappy living with her father and wants to live with them. Living with her father, she "doesn't feel listened to," and "feels as if her concerns are dismissed." She cries a lot. Ex. 3, McQueen Decl. ¶¶ 13-14; *see also* Ex. 4, L. Freeman Decl. ¶¶ 7-8. Put differently, "she has her dad, but he's not a mom." Ex. 4, L. Freeman Decl. ¶ 8.

46.    Ms. Freeman was sexually abused for multiple years as a child, starting when she was nine years old. At that time in her life, she was not living in a safe environment. She did not

have adults protecting her and giving her the attention she needed. Ms. Freeman's own trauma history is making the separation from her 12-year-old daughter particularly painful. Having her daughter in unstable living situations for more than a year has been incredibly stressful for Ms. Freeman, who wants to be by her daughter's side each day to protect her. Ex. 1, C. Freeman Decl. ¶ 31; Ex. 3, McQueen Decl. ¶ 19 ("That's one of my concerns for her daughter, since I have three girls of my own. Girls need to be protected. Carolyn has one child. She deserves a chance to protect her.").

47.     Ms. Freeman's daughter is suffering due to her unstable living arrangements, the inability to visit her other relatives, and the shock of her separation from her mother during a formative period of life. Since Ms. Freeman's re-imprisonment, her daughter has been forced to endure constant changes in where she resides and with whom, which has been particularly difficult given the trauma of her separation from her mother, her grandmother's severe stroke, and the absence of her grandfather. She has experienced a great deal of trauma. Her grades at school have fallen and she has had difficulty regulating her emotions. She feels like she doesn't belong anywhere, and as though no one has time for her. Ex. 1, C. Freeman Decl. ¶¶ 30-31; Ex. 3, McQueen Decl. ¶¶ 18-19; Ex. 4, L. Freeman Decl. ¶¶ 6-8.

48.     Since returning to prison, Ms. Freeman has experienced stress and depression from not being able to care for her daughter and support her mother following her stroke. Ex. 1, C. Freeman Decl. ¶ 31.

49.     If Ms. Freeman were released, she would live with her daughter and provide crucial support to her mother. *Id.* ¶ 32.

50.     Ms. Freeman's continued incarceration will cause irreparable harm as she is currently unable to care for her young daughter and debilitated mother, both who are vulnerable and suffering without her support.

**Implicit Promise of Remaining on Home Confinement Absent Violation**

51.     Individuals on home confinement rely on an implicit promise that they will remain on home confinement until the end of their sentence of imprisonment and will not be re-imprisoned absent a significant violation of the terms of home confinement. They and their families organize their lives around this implicit promise. The reliance and expectation that people on home confinement will not be subject to re-imprisonment by the BOP absent significant violations of the conditions of the home confinement program is reasonable.

52.     The implicit promise of remaining on home confinement absent a violation is derived from an analysis of the statutes and regulations governing home confinement, public communications from BOP leadership, the agreements the BOP requires people to sign when they commence home confinement, communications from BOP staff to individuals before they commence home confinement, communications from the Residential Reentry Centers (RRCs) to individuals they are supervising on home confinement, and the actual practices of the BOP with respect to re-imprisoning people on home confinement.

53.     The BOP's home confinement authority under Section 3624(c) is expressly intended to "afford th[e] prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." Section 3624(c) directs that the BOP "shall, to the extent practicable," place eligible prisoners on home confinement "for the maximum amount of time permitted." The CARES Act modifies only the length of time the BOP is authorized "to place a prisoner in home confinement" under "section 3624(c)(2) of title 18." CARES Act § 12003(a)(2),

(b)(2), 134 Stat. 515, 516. Section 3624(c) gives the BOP authority to place federal prisoners with "lower risk levels and lower needs" on home confinement for "a portion of the final months of [their] term." 18 U.S.C. § 3624(c)(1)-(2). While the BOP may "lengthen" the home confinement period under the CARES Act, that period—however long it may be—is intended to be served during the "final months of [their] term."[4]

54.     In June 2020, then BOP Director Michael Carvajal testified before Congress, along with BOP Medical Director Jeffrey Allen, about the BOP's response to the COVID-19 pandemic. The officials told Congress that the BOP had begun aggressively screening individuals to be placed on home confinement "for service of the remainder of their sentences."[5]

55.     Before being placed on home confinement, an individual "signs an agreement which requires consent to submit to home visits and drug and alcohol testing, acknowledgement of monitoring requirements, and affirmation that he or she will not engage in criminal behavior or possess firearms, among other terms."[6] "Through the use of independent contractors, or, less frequently, the U.S. Probation Office, individuals placed on home confinement are monitored electronically; have check-in requirements; and are subject to alcohol and drug testing and transfer back to secure correctional facilities if there are any significant disciplinary infractions or violations

---

[4]     *Compare* 18 U.S.C. § 3624(c)(2) (providing for home confinement authority as part of prerelease custody) *with* 18 U.S.C. § 3622 (providing for temporary release of a prisoner).

[5]     Dep't of Justice, Statement of Michael D. Carvajal, Director, and Dr. Jeffrey Allen, Medical Director, Director, Federal Bureau of Prisons Before the U.S. Senate Committee on the Judiciary, at 6 (June 2, 2020) (emphasis added), https://www.judiciary.senate.gov/imo/media/doc/Carvajal-Allen%20Joint%20Testimony.pdf (attached hereto as Exhibit 5).

[6]     Memorandum for Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, from Kenneth Hyle, General Counsel, BOP, Re: Views Regarding OLC Opinion, "Home Confinement of Federal Prisoners After the COVID-19 Emergency," at 5 (Dec. 10, 2021), ("General Counsel Memo"), https://www.aclu.org/sites/default/files/field_document/bop_cares_memo_12.10.21.pdf (attached hereto as Exhibit 6).

of the agreement."[7] On December 10, 2021, in describing the operation of the home confinement program under the CARES Act since its enactment, BOP General Counsel Kenneth Hyle explained: "Under regular circumstances, inmates who have made this transition to home confinement would not be returned to a secured facility, unless there was a disciplinary reason for doing so, as the benefit of home confinement is to adjust to life back in the community, and therefore removal from the community would obviously frustrate that goal."[8]

56.    The BOP's Program Statement on Home Confinement provides that "[c]ompliance with the conditions of home confinement may be monitored by electronic monitoring equipment or by regular telephone or in person contacts by supervision staff."[9] "Supervision may be provided by staff from the U.S. Probation Service, contract halfway house services, or other governmental agencies."[10] "To be placed on home confinement, the inmate must sign the 'Conditions of Home Confinement' BP-460(73) prior to placement."[11]

---

[7]    *Id.*

[8]    General Counsel Memo, *supra* note 6, at 5.

[9]    BOP Program Statement 7320.01, CN-2, Home Confinement, at 2 (updated Dec. 15, 2017) https://www.bop.gov/policy/progstat/7320_001_CN-2.pdf (attached hereto as Exhibit 7).
[10]    *Id.* at 2.

[11]    *Id.* at 6. Form BP-A0458, which Ms. Freeman signed, appears to be the currently-applicable form for people on home confinement and is available at https://www.bop.gov/policy/forms/BP_A0548.pdf (attached hereto as Exhibit 8). The form is titled "Home Confinement and Community Control Agreement" and begins with a statement that the individual signing "hereby agree[s] to abide by the following Conditions related to my legal participation on home confinement." *Id.* The form states: "I agree to report to my assigned probation officer or the contractor's facility immediately upon reaching my release destination"; "I understand that if I decline to participate in the recommended home confinement program I may face administrative reassignment out of the community corrections program"; "I agree that during the home confinement period, I will remain at my place of residence, except for employment, unless I am given permission to do otherwise"; "I also understand that I will be required to pay the costs of the program based on my ability to pay"; "I also agree to maintain a telephone at my place of residence without 'call forwarding', a modem, 'Caller ID' or portable cordless telephones for this period"; and "I also agree that, if my confinement is to be electronically monitored, I will wear any electronic monitoring device required, following procedures specified and will not have 'call forwarding' on my telephone.").

57.     The Home Confinement Program Statement requires the BOP's CCMs (now called RRMs, or Residential Reentry Management field offices) to ensure a system is in place for handling violations of program rules that meets due process requirements and "includes provisions for dealing with minor infractions of program rules and with major infractions that could result in the inmate's termination from the program."[12]

58.     Implicit in the program's concern with violations of the rules is the notion that people on home confinement are entitled to retain their liberty as long as they substantially abide by the conditions of the program. The essence of home confinement is release from prison, before the completion of a sentence, on the condition that the individual abide by certain rules during the balance of the sentence.

59.     Direct communications from BOP staff to individuals being released to home confinement have also communicated an implicit promise of remaining on home confinement absent a violation. In both April and May 2020, upper-level BOP staff held multiple Town Hall meetings at the Camp to discuss COVID protocols and the home confinement process. Speaking at these Town Hall meetings were Warden Easter, Ms. Moore, and Ms. Foreman. Women were concerned about being released temporarily and then sent back to prison once the pandemic was over. No one knew at that time how long the pandemic would last. Some women said they would not want to go home if they would have to come back after the pandemic. They asked if the release

---

[12]     *Id.* at 6. Another statutory provision, 18 U.S.C. § 3624(g)(5), applicable at least with respect to individuals on prelease custody (i.e., home confinement or RRC placement) under the First Step Act, shows further the home confinement program's concern with violations. *See id.* § 3624(g)(5) ("Violations of conditions.—If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.").

was to be temporary. Warden Easter, Ms. Moore, and Ms. Foreman reassured them that the only way the women would be brought back to prison would be if they committed misconduct. They said: "The only way you are coming back is if you put yourself here" and "you are the only ones who can send you back." Declaration of Alice Phillips ¶¶ 5-8 ("Phillips Decl.") (attached hereto as Exhibit 9).

60.     After Ms. Freeman was approved for home confinement, BOP staff informed her that she would spend the rest of her sentence at home. Staff never informed Ms. Freeman that she could be re-imprisoned absent a significant violation of program rules. Ms. Freeman was required to sign paperwork before her release to home confinement, and she understood from communications with staff that she would remain on home confinement unless she committed a significant violation of a rule of the home confinement program. *See* Ex. 8, Form; Ex. 1, C. Freeman Decl. ¶ 33.

61.     BOP staff at the Camp also told other women who had been approved for home confinement that they were going home for the rest of their sentences. BOP staff said women released to home confinement would be brought back to prison only if they violated the rules of the home confinement program. *See* Ex. 9, Phillips Decl. ¶ 8, Declaration of Asha Maurya ¶ 5 ("Maurya Decl.") (attached hereto as Exhibit 10).

62.     Ms. Freeman's counselor at the halfway house also communicated to her that she would stay home for the rest of her sentence unless she violated the rules. Ex. 1, C. Freeman Decl. ¶ 34.

63.     Since she has been in BOP custody, Ms. Freeman has understood that home confinement is the final stage of BOP custody and is intended to prepare individuals for reintegration into society. She has understood the difference between home confinement—a time

during which individuals remain in BOP custody and complete their sentence at home—and a furlough, a brief and temporary release from prison. *Id.* ¶ 36.

64.     Ms. Freeman relied on this reasonable expectation that she would serve the rest of her sentence at home unless she committed a major violation of program rules. She relied on this promise when she re-established a close relationship with her 12-year-old daughter and served as her primary caregiver. Likewise, Ms. Freeman's daughter relied on this understanding as well. *Id.* ¶ 7. While on home confinement, Ms. Freeman never heard of an individual being sent back to prison except in instances where BOP alleged misconduct. *Id.* ¶ 35.

## COUNT ONE

### (Violation of Procedural Due Process)

65.     Petitioner-Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

66.     Ms. Freeman has a liberty interest, protected by the Due Process Clause of the Fifth Amendment, in remaining on home confinement.

67.     Procedural protections are due to individuals on home confinement, such as Ms. Freeman, before home confinement can be revoked, because: (1) the nature of their interest in continued liberty on home confinement is within the "liberty or property" language of the Fifth Amendment; and (2) revocation of home confinement constitutes a grievous loss.

68.     Individuals on home confinement, such as Ms. Freeman, are able to do a wide range of activities open to people who have never been convicted of crimes, including living at home with their families, seeking and maintaining gainful employment, pursuing their education, connecting with others in their communities, caring for their loved ones, and forming other

enduring attachments of normal life. Although individuals on home confinement are subject to restrictions, their situation is vastly different from that of incarcerated individuals.

69.     Individuals on home confinement, including Ms. Freeman, have relied on at least an implicit promise that home confinement will be revoked only if they violate the conditions. The implicit promise has been communicated through BOP practices, policies, statements, and governing statutes. Individuals on home confinement have a reasonable expectation that they will not be subject to re-imprisonment by the BOP absent major violations of the conditions of the home confinement program.

70.     Ms. Freeman relied on communications from BOP staff that she would serve the rest of her sentence at home absent a violation. Staff at FCI Danbury explicitly communicated that she would be brought back to prison only if she committed misconduct. Ms. Freeman was never informed that she could be brought back absent cause. Ex. 1, C. Freeman Decl. ¶ 33.

71.     Ms. Freeman and her family relied on at least an implicit promise that she would remain at home absent a violation and therefore had a reasonable expectation that she would remain at home until the end of her sentence absent a significant violation of the terms of home confinement.

72.     Respondents-Defendants' re-imprisonment of Ms. Freeman caused her to suffer a grievous loss and imposed a substantial hardship, as BOP separated her from her young daughter and ailing mother, tearing her away from her loved ones and community, without so much as an opportunity to say goodbye.

73.     Under the Due Process Clause, before re-imprisoning Ms. Freeman, the BOP was required to provide Ms. Freeman with: (1) written notice of the claimed violations of home confinement and the fact that she faced the possibility of re-imprisonment; (2) disclosure of the

evidence against her; (3) the opportunity to be heard in person before a neutral and detached

decisionmaker and to present witnesses and documentary evidence as to the alleged misconduct

and as to whether revocation was warranted should the allegations be established; (4) the right to

confront and cross-examine adverse witnesses at the hearing; and (5) a written statement by the

decisionmaker as to the evidence relied on and reasons for revoking home confinement. *See*

*Young v. Harper*, 520 U.S. 143 (1997); *Morrissey v. Brewer*, 408 U.S. 471 (1972). Ms. Freeman

also had a due process right to the assistance of her counsel in the revocation process. *See Gagnon*

*v. Scarpelli*, 411 U.S. 778, 791 (1973).

74.     Respondents-Defendants' re-imprisonment of Ms. Freeman violates procedural

due process because it deprived Ms. Freeman of adequate notice, the ability to review and

confront the evidence against her, the right to a hearing in front of a neutral and detached official

making the revocation decision, the right to counsel, and the reasons for revoking home

confinement.

## COUNT TWO
### (Declaratory Judgment Act)

75.     All of the foregoing allegations are repeated and realleged as though fully set

forth herein.

76.     The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, provides that "[i]n a

case of actual controversy within its jurisdiction . . . any court of the United States . . . may

declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

77.     There is an actual controversy between the parties because Respondents-

Defendants have refused to provide Ms. Freeman with adequate process before re-imprisoning her

in violation of the Due Process Clause. The Court should exercise its authority under the

Declaratory Judgment Act to declare that Respondents-Defendants have violated Ms. Freeman's constitutional rights.

## REQUEST FOR ENLARGEMENT AS A PROVISIONAL REMEDY

78.    Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting.

79.    The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require" as well as the courts' inherent powers. *See* 28 U.S.C. § 2243.

80.    To qualify for the enlargement remedy, an individual must show "unusual" or "extraordinary circumstances" and that the underlying claim raises "substantial claims." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

81.    As set forth more fully in the attached Memorandum in Support of Enlargement Request, extraordinary circumstances exist given that Ms. Freeman's continued imprisonment will cause irreparable harm to the physical and mental wellbeing of herself, her young, vulnerable daughter, and her infirm mother.

82.    Ms. Freeman has also raised substantial claims, as she was summarily imprisoned by the Respondent-Defendants without the opportunity to present and rebut evidence relating to the revocation decision in front of a neutral decisionmaker, and with no notice of the basis for the revocation decision and the evidence relied upon.

83.    Ms. Freeman requests that the Court enlarge her custody to permit her to live with her daughter and care for her mother, subject to the restrictions in place prior to her re-

imprisonment. In support of her enlargement request, Ms. Freeman relies on the attached

memorandum.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner-Plaintiff respectfully requests that the Court:

a)  Grant enlargement to Ms. Freeman pending disposition of the underlying habeas petition and allow her to go home to her family;

b)  Enter a judgment against Respondents-Defendants and award the following relief:

    a.  Grant a writ of Habeas Corpus requiring Respondents-Defendants to release Ms. Freeman immediately or issue an order directing them to show cause within three days why the Writ of Habeas Corpus should not be granted, pursuant to 28 U.S.C. § 2243;

    b.  Declare that Respondents-Defendants have no basis under the Due Process Clause of the Fifth Amendment to imprison Ms. Freeman;

    c.  Declare Ms. Freeman's imprisonment unlawful;

    d.  Enjoin Respondents-Defendants from imprisoning Ms. Freeman until they provide her the rights to which she is entitled;

    e.  Award Petitioner-Plaintiff reasonable attorneys' fees and costs; and

    f.  Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: December 9, 2022

*/s/ Tadhg A. Dooley*
Tadhg A. Dooley (ct29364)
WIGGIN AND DANA LLP
One Century Tower, P.O. Box 1832
New Haven, CT, 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
tdooley@wiggin.com

*Counsel for Petitioner-Plaintiff*

23

/s/  Sarah F. Russell
Sarah F. Russell, ct26604
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu

Laura Fernandez *
Yale Law School
127 Wall Street
New Haven, CT 06511
Telephone: (203) 432-1779
Email: laura.fernandez@yale.edu

* Application for admission pending