**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CAROLYN FREEMAN**, | |
| *Petitioner-Plaintiff*, | Civil Action No. 22-1567 |
| v. | |
| **TIMETHEA PULLEN**, Warden of Federal Correctional Institution Danbury, in her official capacity, | December 9, 2022 |
| **PATRICK MCFARLAND**, Residential Reentry Manager, in his official capacity, and | |
| **COLETTE S. PETERS**, Director, Federal Bureau of Prisons, in her official capacity, | |
| *Respondents-Defendants.* | |

**PETITIONER-PLAINTIFF'S MEMORANDUM IN SUPPORT OF REQUEST FOR ORDER OF IMMEDIATE ENLARGEMENT AS A PROVISIONAL REMEDY AS THE COURT CONSIDERS HER HABEAS ACTION**

The BOP separated Petitioner-Plaintiff Carolyn Freeman from her 12-year-old daughter and re-imprisoned her based on a single set of breathalyzer tests which indicated alcohol consumption, providing her no opportunity to inform a decisionmaker why imprisonment was unwarranted. Ms. Freeman's imprisonment and separation from her young daughter has been devastating to them both. Shortly after Ms. Freeman was re-imprisoned, her mother suffered a massive stroke that has left her unable to speak or walk. As a result, Ms. Freeman's daughter—who had been living with her grandmother and witnessed her stroke—has been bounced between the homes of four different relatives, which has taken a significant emotional toll. She is desperately in need of the care and support of her mother.

In re-imprisoning Ms. Freeman, the BOP acted in violation of decades of U.S. Supreme Court and Second Circuit precedent establishing the due process rights of people in community release programs facing re-imprisonment. In a closely analogous case, a court in this District concluded that the BOP's practice of re-imprisoning people on home confinement, without a hearing before a decisionmaker and other procedural protections, violates the Due Process Clause. *See Tompkins v. Pullen*, No. 3:22-cv-00339 (OAW), 2022 WL 3212368 (D. Conn. Aug. 9, 2022) (holding that people on home confinement are entitled to the same procedural protections as people on parole and other forms of community release where they are allowed to live at home with family and seek employment).

Multiple courts, including one in this District, have granted provisional release to individuals asserting that the BOP violated their due process rights in re-imprisoning them. *See* Order, *Cardoza v. Pullen*, No. 22-cv-591 (SVN) (D. Conn.) (Dkt. 39) (granting enlargement within five days of an amended habeas petition being filed on behalf of a woman re-imprisoned based on allegation of a positive marijuana test where she demonstrated a compelling need to return home to care for her children); Order, *Lallave v. Martinez et al.*, 1:22-cv-791 (NGG) (E.D.N.Y. Feb. 11, 2022) (granting enlargement request within hours of habeas petition being filed on behalf of woman challenging her re-imprisonment based on allegation of a positive marijuana test where she was separated from her 10-month-old baby); Order, *Daniels v. Martinez, Jr. et al.*, 1:22-cv-918 (LDH) (E.D.N.Y. Feb. 23, 2022) (granting enlargement request five days after petition filed on behalf of woman the BOP re-imprisoned based on allegation of possession of alcohol).[1] As in those cases, and as discussed below, Ms. Freeman has

---

[1] In all three cases, as in Ms. Freeman's case, the BOP re-imprisoned the women without a hearing in front of a neutral and detached decisionmaker and with no explanation of the reasons for the revocation decision. Instead, the only chance each woman had to discuss the allegation of misconduct was at a meeting

demonstrated circumstances warranting enlargement pending adjudication of her Petition-Complaint.

With its initial decision to place Ms. Freeman on home confinement, the BOP concluded that she did not present a risk to public safety. The allegation of misconduct asserted against her—a single set of breathalyzer tests which indicated a low level of alcohol consumption—does not render her dangerous to the community. Her continued confinement, however, is causing severe harm to her daughter.

Ms. Freeman asks that the Court immediately enlarge her place of custody so that she may return home to care for her vulnerable daughter and stricken mother, both of whom desperately need her.

I.  **Enlargement is Appropriate and Necessary Here**

Enlargement is a provisional remedy that federal courts may order in habeas cases, which modifies custody, pending adjudication of a case, by expanding the site at which the custody takes place. An order of enlargement pending the merits of a habeas decision is appropriate if the case is "unusual" or involves "extraordinary circumstances" and the habeas petition raises "substantial claims." *See Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (stating that a "habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective," and the petition raises "substantial claims") (internal quotation marks omitted).[2] As discussed below, Ms. Freeman has established both requirements for enlargement relief.

---

with staff of the halfway house, who had no decisionmaking authority and did not inform the women that they faced re-imprisonment.

[2]    In *Mapp*, the court used the term "bail" instead of enlargement. When a court grants an enlargement request, the petitioner remains legally in custody, but the place of custody is changed, or "enlarged," upon order of the court, from a particular prison to a hospital, halfway house, a person's home, or another setting.

### A.     This Case Involves Extraordinary Circumstances and is Unusual

The harm resulting from Ms. Freeman's separation from her 12-year-old daughter is profound. At the time of her re-imprisonment, Ms. Freeman served as her daughter's primary caregiver, providing her with daily guidance and support.

Ms. Freeman's daughter is suffering terribly with her mother in prison. Since Ms. Freeman's re-imprisonment more than a year ago, her daughter has bounced around among relatives and lost the care of not only her mother but also her grandmother. After Ms. Freeman was re-imprisoned, her daughter initially lived with Ms. Freeman's friend, who did not provide her with the care that she needed. She then went to live with her grandmother, who suffered a massive stroke several months later, which left her unable to walk or speak. Ms. Freeman's daughter witnessed the stroke as she was getting ready for school one morning. When she went into her grandmother's room to ask her a question, her grandmother appeared confused and slurred her words. Her face then began to droop on one side and she started noticeably drooling. Ex. 1, C. Freeman Decl. ¶¶ 25-26; Ex. 4, L. Freeman Decl. ¶ 4. Following the stroke, Ms. Freeman's aunt took in both the grandmother (her sister) and Ms. Freeman's daughter. For some time, Ms. Freeman's daughter was shuttled back and forth between the aunt's residence and her father's residence. But, caring for her sister (now mostly paralyzed), her own children, and Ms. Freeman's daughter became too much for the aunt. Ex. 1, C. Freeman Decl. ¶ 28; Ex. 4, L. Freeman Decl. ¶ 5.

Since September 2022, Ms. Freeman's daughter has had to live with her father, who she never lived with prior to her mother's re-imprisonment. Her father is in his 50s, and lives with

---

*See* Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ¶¶ 28-29, *Whitted v. Easter*, 20-cv-569 (MPS) (Dkt. 1, Ex. B). Enlargement is part and parcel of Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

4

his male cousin, who is around the same age. Also living at the residence are the cousin's twin teenage sons, both of whom have autism and require special care. The household is chaotic and overcrowded, and Ms. Freeman's daughter is forced to sleep in the living room, without any private space to herself, despite the fact that she is the only female in the home. Although the twins are older than her, Ms. Freeman's daughter is expected babysit for them. This would be a difficult situation for any preteen girl, but her daughter's suffering is exacerbated by the fact that it followed the sudden, traumatic separation from both her mother and her grandmother, coupled with her own displacement. She is unable to regularly visit her mother's side of the family because her father is unwilling to drive her or pick her up. In addition to longing for and worrying about her mother and grandmother, the destruction of these family ties has taken a significant toll on her emotional wellbeing. Ex. 1, C. Freeman Decl. ¶ 29-30; Ex. 3, McQueen Decl. ¶¶ 12-19; Ex. 4, L. Freeman Decl. ¶¶ 6-8.

Ms. Freeman's daughter has been traumatized by losing her mother to prison, her grandmother's stroke, and all the moves she has been forced to make in the past year. Ms. Freeman's daughter shared a close bond with her grandmother, who has not recovered her ability to walk or speak. Ms. Freeman calls her daughter from the prison every morning but has not seen her in person for more than a year. The continued confinement of Ms. Freeman during the formative years of her daughter's life is doing great damage, as her daughter has endured transition after transition in her living environment and now lives without her mother or grandmother. Her daughter feels like she does not belong anywhere and like no one has time for her. She is withdrawn and her grades have dropped in school. Ex. 1, C. Freeman Decl. ¶¶ 30-31; Ex. 3, McQueen Decl. ¶¶ 13-18; Ex. 4, L. Freeman Decl. ¶ 8.

Ms. Freeman was sexually assaulted as a child for multiple years, beginning when she was nine years old. She was in an unsafe living environment and did not have adults around who were protecting her. Ms. Freeman's trauma history is making her separation from 12-year-old daughter particularly painful. Ms. Freeman wants to be by her daughter's side each day to protect her, and her inability to do so is causing her serious anxiety. Ms. Freeman's confinement has also prevented her from caring for her mother, now severely debilitated by the stroke. Ex. 1, C. Freeman Decl. ¶¶ 30-31; Ex. 3, McQueen Decl. ¶ 19.

Ms. Freeman seeks an order of enlargement to be with her daughter so that she may provide her with care, support, and a stable living environment. Extraordinary and unusual circumstances exist, given the needs of Ms. Freeman's daughter, the impact of her incarceration on her daughter's life, the condition of her mother, and nature of Ms. Freeman's habeas claim.

This habeas petition seeks to redress the harm imposed by the BOP's home confinement revocation practices. The central claim of this petition is that Ms. Freeman should have had notice of the BOP's intent to re-imprison her and been provided with the opportunity *to have her case heard*. Specifically, Ms. Freeman should have been able to explain to the BOP decisionmakers the vital role she plays in her family, the need to provide care for them, and any other reasons why the BOP should have allowed her to remain on home confinement. The harm that Ms. Freeman and her daughter are suffering as a result of the BOP's unlawful imprisonment every day is irreparable, and the habeas seeks to redress this harm. Her daughter's need for her has only grown during her unlawful re-imprisonment.

In *Lallave v. Martinez*—litigated by undersigned counsel and challenging the lack of process in BOP home confinement revocation—the district court granted the request for enlargement where the alleged misconduct was similar to this case (there, a single positive test

6

for marijuana), and the family circumstances were also extraordinary (in that case, the petitioner's incarceration separated her from her job and her 10-month-old baby). *See Lallave v. Martinez*, No. 22-cv-4136 (NGG), 2022 WL 7578794, at *1 (E.D.N.Y. Oct. 13, 2022) ("The court granted Petitioner's request for enlargement because of the irreparable harm that incarceration would cause to her family and employment, and she was released from the MDC on February 12, 2022."); *id.*, Feb. 11, 2022 Order (granting enlargement). Similarly, in *Cardoza v. Pullen*, No. 22-CV-591 (SVN) (D. Conn.), also litigated by undersigned counsel, the Court granted enlargement based in part on family circumstances, noting that "the combination of medical needs of Petitioner's family members, including her fiancé's serious medical conditions and her daughter's mental health condition, make this an unusual case." *Id.* (Dkt. 39). In granting the request, the Court observed: "While on home confinement, the family developed a unique dependence on Petitioner in part because of these various medical needs, such that her reimprisonment caused a hardship well beyond the typical hardship a family experiences when a loved one is incarcerated or reincarcerated." Here too, Ms. Freeman's daughter developed a unique dependence on Ms. Freeman during the time that she was on home confinement. Ms. Freeman spent each day with her daughter—getting her dressed in her uniform for school, helping her to do her hair, cooking her meals, helping her with her homework, and providing her with a stable, joyful, and loving home life. *See* Ex. 1, C. Freeman Decl. ¶¶ 7-9. The hardship her daughter is experiencing now—which has resulted from losing both her mother and grandmother's care and bouncing between multiple homes—goes beyond the typical hardship caused by a family member being incarcerated.[3]

---

[3] Other courts have recognized that the harms resulting from family separation can constitute "extraordinary" or "unusual" circumstances justifying enlargement. For example, in *S.N.C. v. Sessions*, No. 18 CIV. 7680 (LGS), 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018), the district court granted provisional release of a woman detained by immigration authorities whose PTSD and depression were exacerbated by

7

In addition to the extraordinary harm resulting from Ms. Freeman's re-imprisonment, the case is "unusual" in that it is a not a typical habeas petition brought by an incarcerated individual challenging the validity of a state or federal conviction. In such cases, an individual has been convicted in court after plea or trial, has had a sentence of incarceration imposed by a judge, and has had the opportunity to pursue an appeal. Here, in contrast, Ms. Freeman was re-imprisoned based on a single set of breathalyzer tests, which indicated alcohol consumption, with no opportunity to be heard by a neutral decisionmaker about whether imprisonment was warranted given the harm that would result to herself and her family from re-imprisonment. *Cf. S.N.C. v. Sessions*, No. 18 CIV. 7680 (LGS), 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018) (in granting provisional release to habeas petition, noting "Petitioner is not pursuing a routine application to adjust her status"). The BOP initially released Ms. Freeman to home confinement based on her low public safety risk.[4] She scored a "Minimum" on the BOP's risk assessment based on, *inter alia*, her lack of criminal history and her efforts towards rehabilitation—which included earning her GED, completing a multitude of vocational classes and programs, and working in a variety of jobs for which she received positive work evaluations for the "great pride" she took in her duties. Once home, she secured a stable full-time job taking care of vulnerable patients at a hospital and was about to start classes aimed at advancing her career. She was closely monitored by the halfway house and regularly tested for alcohol and drug use. The incident report that led to Ms. Freeman's re-imprisonment was the only incident report she received in the nine months that she spent on home confinement. *See* Ex. 1, C. Freeman Decl. ¶¶ 4, 10, 12-13.

---

her detention and separation from her young children, where the habeas petition sought to stop her removal from the country under the Administrative Procedure Act and the Due Process Clause. In considering her case, the court noted that her "personal circumstances are not that of the usual Petitioner." *Id.* at *6.

[4]   During her initial prosecution, Ms. Freeman was on pretrial release until she was sentenced. She has no other criminal convictions.

The unusual circumstances of Ms. Freeman's imprisonment, coupled with the irreparable harm caused by her separation from her daughter, justify enlargement pending the resolution of the case.

### B. Ms. Freeman Raises Substantial Claims

Ms. Freeman meets the second requirement for enlargement because her Petition-Complaint raises a substantial claim that the BOP has violated her procedural due process rights in re-imprisoning her.

Two courts in this District have already ruled favorably in considering similar due process claims. In *Tompkins v. Pullen*, No. 3:22-cv-339 (OAW), 2022 WL 3212368 (D. Conn. Aug. 9, 2022), the Court held that that people on home confinement are entitled to the same procedural protections as people on parole who face re-imprisonment and that the BOP had violated the petitioner's due process rights. In *Cardoza v. Pullen*, No. 22-cv-591 (SVN) (D. Conn.), the Court granted enlargement to a petitioner re-imprisoned by the BOP, concluding that "Petitioner raises a substantial claim of a violation of her procedural due process rights." Aug. 22, 2022 Order (Dkt. 39). The petitioners in *Tompkins* and *Cardoza*, like Ms. Freeman, were denied a hearing in front of the decisionmaker and a written statement of the reasons for re-imprisonment, among other procedural protections.

As the *Tompkins* and *Cardoza* courts recognized, the U.S. Supreme Court's decisions in *Morrissey* and *Young* provide the framework governing analysis of the due process rights of people on community release who face the possibility of re-imprisonment. *Tompkins v. Pullen*, No. 3:22-cv-339 (OAW), 2022 WL 3212368, at *11 (D. Conn. Aug. 9, 2022) ("[T]he court agrees that *Morrissey*, *Young*, and *Kim* are directly applicable to the case at bar."); Aug. 22, 2022 Order (Dkt. 39), *Cardoza v. Pullen*, No. 3:22-cv-591 (SVN) (D. Conn.) (concluding that

petitioner raised a substantial claim "given the line of cases that begin with *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), and *Young v. Harper*, 520 U.S. 143, 152-53 (1997)."). *Morrissey* held that individuals on parole have a liberty interest in remaining in the community that is protected by the Due Process Clause, and *Young* concluded that *Morrissey* protections apply to people on preparole community supervision. In *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999), the Second Circuit held that *Morrissey* and *Young* govern people living at home on work release in the custody of New York State prison authorities.

Establishing a liberty interest triggering due process rights depends not only on "the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language" of the Due Process Clause. *Morrissey*, 408 U.S. at 481. Regarding the "weight" of the interest, *Morrissey* explained that "[w]hether any procedural protections are due depends on the extent to which an individual will be condemned to suffer grievous loss." *Id.* (internal quotation marks omitted). When her home confinement was revoked, Ms. Freeman plainly suffered "grievous loss" warranting due process protections. Not only did her re-imprisonment cause her to lose her job, but it tore her away from her daughter, who depended on her heavily. *See Cardoza v. Pullen*, No. 3:22-CV-00591 (SVN), 2022 WL 3212408, at *11 (D. Conn. Aug. 9, 2022) ("The Court first finds that Petitioner has plausibly alleged that, when her home confinement was revoked, she suffered a 'grievous loss' of freedom. Petitioner alleges that she was remanded from home confinement, where she lived with her fiancé, children, and stepchildren, to a federal prison. Petitioner further alleges that, while living at home, she cared for her family, was permitted to work, and was able to form certain attachments common to normal life.") (internal citation omitted).

In determining whether the "nature" of the interest at issue in *Morrissey* triggered due process rights, the Supreme Court stated:

> We turn to an examination of the nature of the interest of the parolee in his continued liberty. The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.
>
> We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.

*Morrissey*, 408 U.S. at 481-82 (footnote omitted); *see also Young*, 520 U.S. at 148 (quoting a portion of the above passage, stating "[t]his passage could just as easily have applied to respondent while he was on preparole" and concluding that Oklahoma preparole program was sufficiently similar to parole at issue in *Morrissey* to trigger the same due process protections).

Although individuals on home confinement remain technically in BOP custody, they are permitted to live at home with their families, seek and maintain employment, pursue educational opportunities, participate in treatment programs, attend religious services, and engage in various other activities in their communities. The features of the BOP's home confinement program mirror the parole, preparole, and work release programs at issue in *Morrissey* and *Young*, where the Supreme Court held that the "nature" of the interest triggered due process protections. *See*

11

*Morrissey*, 408 U.S. at 481-82; *Young*, 520 U.S. at 148 ("In compliance with state procedures, he was released from prison before the expiration of his sentence. He kept his own residence; he sought, obtained, and maintained a job; and he lived a life generally free of the incidents of imprisonment. To be sure, respondent's liberty was not unlimited. He was not permitted to use alcohol, to incur other than educational debt, or to travel outside the county without permission. And he was required to report regularly to a parole officer. The liberty of a parolee is similarly limited, but that did not in *Morrissey* render such liberty beyond procedural protection.") (citations omitted); *see also Kim*, 182 F.3d at 118 (holding that individual in work release program in the custody of the New York Department of Correctional Services had a liberty interest triggering due process protections where the "work release program in which Kim participated, at least the final phase in which she lived at home and worked at a job, while regularly reporting to [supervisors], is virtually indistinguishable from either traditional parole or the Oklahoma program considered in *Young*"); *Tompkins v. Pullen*, No. 3:22-CV-00339 (OAW), 2022 WL 3212368, at *11 (D. Conn. Aug. 9, 2022) ("Home confinement is a variation of traditional imprisonment that bears the same 'essential' features as the programs at issue in *Morrissey*, *Young*, and *Kim*. Petitioner was released from prison, before the completion of her sentence, on the condition that she abide by certain rules. She was able to work, go to school, and reunite her family. In sum, she enjoyed substantial liberty. The liberty of an individual on home confinement, like that of a parolee, thus 'includes many of the core values of unqualified liberty,' and '[i]ts termination calls for some orderly process, however informal.'") (quoting *Morrissey*, 408 U.S. at 482).

All the markers of a protected liberty interest when an individual is serving a custodial sentence in the community are present here. Ms. Freeman spent nine months rebuilding her life

outside of prison. She obtained a full-time job at a hospital, planned to pursue schooling to advance her career, and was the primary caregiver for her daughter. The features of the home confinement program entitle her to protection under the Due Process Clause before the BOP deprives her of her liberty.

Moreover, although an "implicit promise" by the BOP that Ms. Freeman would stay home absent a violation of the terms of the home confinement program is not a controlling factor, Ms. Freeman's Petition-Complaint nonetheless contains detailed allegations of such a promise, and cites and attaches evidence supporting these allegations.[5] As set forth in the Petition-Complaint, the implicit promise, and reasonable expectation, of remaining on home confinement absent a violation is derived from an analysis of the statutes and regulations governing home confinement, public communications from BOP leadership, the agreements the BOP requires people to sign when they commence home confinement, and the actual practices of the BOP with respect to re-imprisoning people on home confinement. *See* Petition ¶¶ 51-57. Further supporting this implicit promise and reasonable expectation are communications from BOP staff to individuals before they commence home confinement, as well as communications

---

[5] *Morrissey* or *Young* nowhere state that such an implicit promise is a dispositive factor in creating a liberty interest. In *Tompkins*, the Court observed that "it is not clear how heavily this promise or this reliance weighed in the overall analysis" but nonetheless concluded that "[r]egardless of the weight to be given this factor, however, there is ample evidence in the record which could lead Petitioner to reasonably expect that she would not be reincarcerated without cause." *Id.* In *Cardoza*, the Court did find the presence of an implicit promise dispositive, initially dismissing the petition-complaint on the ground that Ms. Cardoza failed to allege an implicit promise that she would remain on home confinement absent a disciplinary violation. *See Cardoza*, 2022 WL 3212408, at *12. However, after Ms. Cardoza refiled her petition-complaint with allegations supporting an implicit promise (and supporting evidence), the court promptly granted her request for enlargement—observing that she had raised a substantial claim that her due process rights were violated. *See* Order, *Cardoza v. Pullen*, No. 22-CV-591 (SVN) (D. Conn.) (Dkt. 39) ("The amended petition contains allegations concerning this implicit promise, and attaches various pieces of evidence that Petitioner believes support her allegations. After review of the allegations in the amended petition, the Court finds that Petitioner raises a substantial claim of a violation of her procedural due process rights . . . .").


from the residential reentry centers to individuals they are supervising on home confinement. *Id.* ¶¶ 58-61.

As with the parole system at issue in *Morrissey*, implicit in the home confinement program's concern with violations of the rules of home confinement is the notion that people on home confinement are entitled to retain their liberty as long as they substantially abide by the conditions of the home confinement program. *See Morrissey*, 408 U.S. at 479. As with parole, the essence of home confinement is release from prison, before the completion of sentence, on the condition that the individual abide by certain rules during the balance of the sentence. *Id.* at 477. Individuals on home confinement have relied on this implicit promise and reasonably expect to remain on home confinement absent significant infractions. *See Tompkins v. Pullen*, No. 3:22-CV-00339 (OAW), 2022 WL 3212368, at *11 (D. Conn. Aug. 9, 2022) (concluding that "even if Petitioner's reasonable expectations were dispositive, there is ample evidence from which to conclude that Petitioner did have a reasonable expectation that she would remain on home confinement absent misbehavior" referencing, *inter alia*, the statements of Director Carvajal and General Counsel Hyle, the fact that as "the express purpose of § 3624(c) is reintegration into society, one might reasonably expect that the BOP would not thwart such efforts absent good reason," and "as in *Young*, it appears that Petitioner never was informed that she could be removed from home confinement absent cause, thereby reasonably creating the implicit belief that she would not be remanded without reason"). Here, not only do BOP's governing statutes, policies, procedures, and communications from leadership create an implicit promise of remaining on home confinement absent a violation, but such a promise was explicitly provided through direct communication from staff at FCI Danbury to Ms. Freeman and other individuals at the Camp in the early months of the pandemic. Petition ¶¶ 51-61.

Although individuals on home confinement remain technically in BOP custody, they are allowed to live at home with their families, seek and maintain employment, pursue educational opportunities, participate in treatment programs, attend religious services, and engage in various other activities in their communities. Thus, in addition to establishing an implicit (and even explicit) promise, Ms. Freeman has also demonstrated that the other features of the home confinement program mirror the parole, prepare, and work release programs at issue in *Morrissey* and *Young*, where the Supreme Court held that the "nature" of the interest triggered due process protections. *See Morrissey*, 408 U.S. at 481-82; *Young*, 520 U.S. at 148; *Kim*, 182 F.3d at 118. Accordingly, Ms. Freeman has established that the nature of her interest in remaining on home confinement is one within the meaning of the Due Process Clause, and the termination of her home confinement amounts to a grievous loss triggering the procedural protections of *Morrissey* and *Young*.

Under *Morrissey*, before revoking Ms. Freeman's home confinement, the BOP was required to provide Ms. Freeman with: (1) written notice of the claimed violations of home confinement and the possibility that she faced re-imprisonment; (2) disclosure of the evidence against her; (3) the opportunity to be heard in person before a neutral and detached decisionmaker and to present witnesses and documentary evidence as to the alleged misconduct and as to whether revocation was warranted should the allegations be established; (4) the right to confront and cross-examine adverse witnesses at the hearing; and (5) a written statement by the decisionmaker as to the evidence relied on and reasons for revoking home confinement. *See Morrissey*, 408 U.S. at 471-72.[6]

---

[6] Ms. Freeman also had a due process right to the assistance of her counsel when she faced revocation of home confinement. *See Gagnon v. Scarpelli*, 411 U.S. 778, 791 (1973). In *Gagnon*, the Supreme Court held that individuals facing probation or parole revocation must be advised of their limited right to counsel and counsel presumptively should be appointed where requested if the person asserts either: (1) innocence

Ms. Freeman was denied all of these procedural protections. Before revoking her home confinement based on a set of positive breathalyzer readings, the BOP provided no opportunity whatsoever for Ms. Freeman to appear in front of the person or group of people making the home confinement revocation decision. Contrary to the requirements of *Morrissey*, Ms. Freeman had no ability to present and confront evidence at a hearing in front of a neutral and detached decisionmaker regarding the allegations against her and, even if the allegations were established, why re-imprisonment was not an appropriate sanction. *See Morrissey*, 408 U.S. at 488 (holding that the individual "must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation"). Nor did Ms. Freeman have the assistance of counsel, as *Gagnon v. Scarpelli*, 411 U.S. 778, 791 (1973) required given the circumstances.

Instead, Ms. Freeman spoke about the incident only with staff of the Kintock Group, which contracts with BOP to provide supervision to individuals placed on home confinement in the area. These staff members had no decisionmaking authority, did not provide her with the evidence underlying her charge, failed to provide access to counsel at the meeting, and did not inform her that she faced the possibility of returning to prison. Ex. 1, Freeman Decl. ¶¶ 16-17, 23. Ms. Freeman never had the opportunity to appear in front of any BOP decisionmaker. To date, BOP has not given Ms. Freeman a written explanation (or any explanation) of the reasons for revocation and the evidence relied upon, as *Morrissey* requires. *Id.* ¶¶ 22, 23.

---

of the alleged misconduct; or (2) the existence of substantial mitigating factors that are difficult to present. In addition, in determining whether counsel should be appointed, authorities must consider the individual's ability to speak on his own behalf. If a request for counsel is denied, the reasons for denial must be explained in the record. The Second Circuit has concluded that the use of counsel as described in *Gagnon* extends to parole rescission hearings as well. *See Drayton v. McCall*, 584 F.2d 1208, 1220 (2d Cir. 1978).

Such conduct by BOP plainly violated Ms. Freeman's procedural due process rights and entitles her release home until a hearing that complies with due process requirements is provided.

## II.   This Court Should Grant Ms. Freeman's Enlargement Request

For the reasons described above, this Court should grant Ms. Freeman's enlargement request and allow her to return home to care for her vulnerable young daughter and ailing mother. Ms. Freeman respectfully requests that the Court enter the enlargement order forthwith.

Respectfully submitted,

CAROLYN FREEMAN

Dated:  December 9, 2022          By:     */s/ Tadhg A. Dooley*
Tadhg A. Dooley (ct29364)
WIGGIN AND DANA LLP
One Century Tower, P.O. Box 1832
New Haven, CT, 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
tdooley@wiggin.com

*/s/  Sarah F. Russell*
Sarah F. Russell, ct26604
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
Telephone: (203) 582-5258
Email: sarah.russell@quinnipiac.edu

Laura Fernandez *
Yale Law School
127 Wall Street
New Haven, CT 06511
Telephone: (203) 432-1779
Email: laura.fernandez@yale.edu

* Application for admission pending