## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CAROLYN FREEMAN, | ) | |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | 3:22-CV-1567 (OAW) |
| TIMETHEA PULLEN, PATRICK | ) | |
| MCFARLAND, and COLETTE S. | ) | |
| PETERS, | ) | |
| *Respondents*. | ) | |
| | ) | |
| | ) | |

## ORDER GRANTING WRIT OF HABEAS CORPUS

**THIS CAUSE** is before the court upon Petitioner's Petition for Writ of Habeas Corpus ("Petition"). *See* ECF No. 1. The court has reviewed the Petition, Respondents' response, *see* ECF No. 14, Petitioner's reply, *see* ECF No. 15, all supporting exhibits, and the record in this matter and is thoroughly advised in the premises. For the reasons discussed herein, the Petition is **GRANTED.**[1]

## I.   BACKGROUND

The facts of this case are not in dispute. At the advent of the COVID-19 pandemic, Petitioner was incarcerated at the Federal Correctional Institute in Danbury, Connecticut ("FCI Danbury"). ECF No. 1 at ¶ 13. The Bureau of Prisons ("BOP"), under authority granted by Congress in the Coronavirus Aid, Relief, and Economic Security Act (better

---

[1] Petitioner requested oral argument, but the court finds that it is able to rule on the Petition based on the papers alone. *See Blackmon v. United States*, No. 3:16-CV-1080 (VAB), 2019 WL 3767511, at *8 n.9 (D. Conn. Aug. 9, 2019) (exercising the court's discretion to rule on a habeas petition without oral argument).

known as the "CARES Act"), released Petitioner to home confinement sometime in December of 2020.[2]  *Id.* at ¶ 15.

Throughout her time on home confinement, Petitioner was supervised by staff at a halfway house in Newark, New Jersey.  *Id.* at ¶ 16.  The halfway house is run by the Kintock Group, which contracts with the BOP to supervise individuals on home confinement.  *Id.*  She reported to the halfway house several times per month to check in and to undergo routine drug testing.  *Id.*  The terms of her home confinement were such that Petitioner was not permitted to leave her home except for work and for other approved departures.  ECF No. 1-9.[3]

Upon her release, Petitioner reunited with her daughter (then ten years old), secured employment, and enrolled in classes at a local college.  ECF No. 1 at ¶¶ 17, 20.  She remained on home confinement for approximately nine months.  *Id.* at ¶ 1.

There is no record of Petitioner violating any conditions of her home confinement until September 4, 2021 (some nine months after her release).  On that day, Petitioner was given a random breathalyzer test which reported her blood alcohol content as .116.  *Id.* at ¶ 22–23.  A second test ten minutes later returned a result of .113.  *Id.* at ¶ 23.  Kintock staff spoke with her about the results, but permitted her to return home that day.  *Id.* at ¶ 24.  On September 7, 2021, Kintock staff called Petitioner to inform her that they were recommending to BOP that Petitioner lose 41 days of good time credit (an incentive for good behavior which a sentenced individual may accrue and which can shorten their

---

[2] Petitioner's release also was pursuant to a temporary restraining order issued in an action brought against the warden of FCI Danbury, *Martinez-Brooks v. Easter*, No. 20-CV-569-MPS, 2020 WL 2405450 (D.Conn. May 12, 2020).  ECF No. 1 at 5 n.2.
[3] It also appears from the facts presented that consumption of alcohol was prohibited while on home confinement, but there is no clear assertion of this fact in the materials.

overall sentence). *Id.* at ¶ 25. For the following two weeks, Petitioner remained in the community until she was instructed to report to the halfway house on September 20, 2021. *Id.* at ¶ 26. The following morning, she was returned to prison, *id.* at ¶ 27, without first having been warned that when she reported to the halfway house, she would risk reincarceration. *Id.* at ¶ 26–27. On September 28, one week after her reimprisonment, BOP's Disciplinary Hearing Officer agreed with Kintock's recommendation that Petitioner should lose 41 days of good time credit. *Id.* at ¶ 29.

Petitioner filed her habeas petition on December 9, 2022, alleging violations of the Due Process Clause of the Fifth Amendment of the United States Constitution. In the Petition, she asked for immediate enlargement, which the court denied. However, the court granted her motion for an order that Respondents show cause why the petition should not be granted. When Respondents complied, Petitioner filed a reply in which she renewed her request for immediate enlargement. She also separately filed a motion for a temporary restraining order instructing the BOP to release her to home confinement pending the resolution of her Petition. Her projected release date is March 1, 2024.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2241, "the federal courts have the power to grant writs of habeas corpus [o]n behalf of, *inter alios*, prisoners who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Poindexter v. Nash*, 333 F.3d 372, 377 (2d Cir. 2003) (quoting 28 U.S.C. § 2241) (internal citations omitted). A petition pursuant to § 2241 is an appropriate manner to challenge the execution of a sentence, including the conditions of confinement. *Id.* Petitioner "bears the burden of proving that

[s]he is being held contrary to law; and because the habeas proceeding is civil in nature, [she] must satisfy [t]his burden of proof by a preponderance of the evidence." *McDonald v. Feeley*, 535 F. Supp. 3d 128, 135 (W.D.N.Y. 2021) (quoting *Dzhabrailov v. Decker*, No. 20-CV-3118 (PMH), 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020)).


III.   **DISCUSSION**

Petitioner asserts that Respondents' conduct violated her procedural due process rights under the Fifth Amendment.  Specifically, she asserts that she had a liberty interest in remaining on home confinement, and therefore that she was entitled to certain procedural protections before being reincarcerated, including notice of the alleged violation(s), a hearing before a neutral decisionmaker, and a written statement from the decision maker laying out the evidence and reasoning underpinning the ultimate decision, all of which BOP failed to provide her.  She seeks declaratory judgment (pursuant to the Declaratory Judgment Act, or "DJA") that her rights were violated, her immediate release, an injunction prohibiting her reincarceration absent correction of the alleged violations, and compensation to recover her attorneys' fees and costs.

Respondents take the position that the BOP has exclusive and unlimited discretion to "redesignate" individuals on home confinement, for any reason or no reason at all. They argue that Petitioner has no liberty interest in remaining on home confinement, and therefore that she was not entitled to any process at all before her reincarceration.  They further argue that the Petition is not properly before this court, since Petitioner failed to exhaust her administrative remedies prior to initiating this action.

The court will address the issue of exhaustion first.

**A. Exhaustion**

Exhaustion of administrative remedies is a precondition of habeas relief; a petitioner is required to present their grievance to the relevant custodial authority and to pursue that relief through all available administrative appeals before filing a habeas petition in federal court. *Muhmmaud v. Murphy*, No. 3:08-CV-1199 (VLB), 2009 WL 4041404, at *9 (D. Conn. Nov. 19, 2009). For some petitions, exhaustion is mandated by statute, but for others, the requirement is merely prudential, meaning courts require it even in the absence of a legislative mandate. *Pimentel v. Gonzales*, 367 F. Supp. 2d 365, 371 (E.D.N.Y. 2005). Still, the prudential requirement often has certain exceptions. *Beharry v. Ashcroft*, 329 F.3d 51, 56 (2d Cir. 2003), as amended (July 24, 2003).

The government argues that Petitioner failed to satisfy the exhaustion requirement, and that there is no applicable exception. Petitioner challenges each point, arguing that she pursued her grievance administratively, and that even if she did not, exhaustion merely is prudential in this case and should be excused.

Although Petitioner raised her due process claim through the BOP grievance process, her grievance was untimely; BOP procedure requires that grievances be submitted within 20 days of a subject incident, *see* 28 C.F.R. § 542.14(a), and Petitioner did not raise her due process claims until more than one full year after her reincarceration, *see* ECF No. 15-3. Therefore, she did not satisfy the exhaustion requirement. However, the court agrees with Petitioner that the requirement should be excused in this instance.

Although the government argues that the Prison Litigation Reform Act ("PLRA") applies to this instance (requiring exhaustion absent an unavailable grievance process), its statutory exhaustion requirement is not applied to habeas proceedings in this circuit.

*See Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001) (noting the court's previous holding in a § 2254 action that the PLRA does not apply to habeas proceedings, and stating that "[d]oubtless the same rule should obtain in § 2241 cases as in § 2254 petitions.").  Rather, petitions such as the one at issue are subject to the *judicially-created* exhaustion requirement.  Accordingly, exhaustion may be excused in three circumstances: where it would be futile, where the administrative process would be incapable of granting relief, and where exhaustion would impose undue prejudice upon a petitioner.  *See Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 437 (D. Conn. 2020) (citing *Washington v. Barr*, 925 F.3d 109, 118-19 (2d Cir. 2019)).

Petitioner argues that in this case, exhaustion would have been futile because the BOP already has decided that individuals on home confinement may be recalled to prison at any time, for no reason at all, and also that absolutely no process is due to individuals on home confinement prior to their reincarceration by BOP.  Although the government asserts that no exception applies, it offers no argument to support that conclusion.

The court agrees with Petitioner that her failure to exhaust may be excused for reasons of futility.  Futility may exist "either because agency decisionmakers are biased or because the agency has already determined the issue."  *Washington*, 925 F.3d at 118.  The government claims that individuals such as Petitioner on home confinement are not entitled to any due process whatsoever before their remand to prison.  *See* ECF No. 14 at 6 n.1 ("[T]he respondents' litigation position was and continues to be that no process was due prior to the petitioner's redesignation . . . .").  So while Respondents assert that "[P]etitioner's successful argument" would force BOP to return her to home confinement, *id.*, they ignore the fact that Petitioner's argument was predestined to be *unsuccessful.*

BOP does not recognize a need for due process, so it would be futile for any inmate to seek redress on this point.  With this backdrop, it is clear that if BOP were to have seriously considered Petitioner's constitutional claim, it more likely would have done so in the months after the undersigned's decision in *Tompkins v. Pullen*, No. 3:22-CV-00339 (OAW), 2022 WL 3212368, at *1 (D. Conn. Aug. 9, 2022) (finding certain process is due before an individual on home confinement may be reincarcerated), and not in the days following Petitioner's September 2021 reincarceration.  Yet when Petitioner filed her grievance in October 2022, BOP still summarily dismissed it.  *See* ECF No. 15-6.  The court therefore concludes that the exhaustion requirement is excused in this case.

### B.  Liberty Interest

Turning to procedural fairness, while the parties agree that a liberty interest must exist to trigger due process obligations, they disagree as to whether individuals on home confinement have a liberty interest such that they are entitled to certain process before they are returned to prison.  Petitioner asserts that she does have a liberty interest in remaining on home confinement and that her reincarceration was unlawful because she was not afforded the process she was due.  Respondents contend that Petitioner's reincarceration was a mere "redesignation," which gives rise to no liberty interest, and so Petitioner was not entitled to any procedural protections.  Each party asserts that current, valid caselaw supports their position.  In resolving this question, it is useful to briefly summarize liberty interest jurisprudence.

#### 1.  *Relevant Jurisprudence*

In *Morrissey v. Brewer*, 408 U.S. 471 (1972), the Supreme Court reviewed the claims of two habeas petitioners who had been paroled from Iowa prisons and who were

reincarcerated (without any process) for violating the conditions of their parole.  The Court found that parole, as a conditional form of liberty, still "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."  *Id.* at 482.  Further, the Court found that "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."  *Id.*  Thus, the Court concluded that the *Morrissey* petitioners indeed had a liberty interest in remaining on parole.

The Court seemed to depart from the *Morrissey* method of analysis in *Sandin v. Conner*, 515 U.S. 472 (1995), by establishing a new standard for assessing jail-related due process claims, holding that a restraint imposed upon on a prisoner must present an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" in order to "create liberty interests … protected by the Due Process Clause." *Id.* at 484.  However, only a few years later in *Young v. Harper*, 520 U.S. 143 (1997), the Court found that an Oklahoma inmate had a liberty interest in remaining on a pre-parole status.  There, the Court first cited *Morrissey* in describing liberties afforded while on parole, noting that a parolee can find employment and can be with family, and that while a parolee is subject to governmental restrictions not imposed on other citizens, "his condition is very different from that of confinement in a prison . . . ." *Young*, 520 U.S. at 147 (quoting *Morrissey*, 408 U.S. at 482) (alteration in original).  This description, the Court found, "could just as easily have applied" to the Oklahoma pre-parolee, who maintained his own residence, secured gainful employment for himself, and "lived a life generally free of the incidents of imprisonment."  *Id.* at 148.  The Court concluded that Oklahoma's pre-parole program was so similar to the parole program presented in

*Morrissey* that *Morrissey* was controlling, and thus that the pre-parolee did have a liberty interest that entitled him to *Morrissey* protections. *Id.* at 152-53. The *Young* Court declined to apply the "atypical and significant hardship" test.

Throughout this evolution of Supreme Court jurisprudence, the Second Circuit consistently has found that individuals have a liberty interest in remaining in various community confinement programs. In *Tracy v. Salamack*, 572 F.2d 393 (2d Cir. 1978), the Second Circuit agreed with a district judge's conclusion that a New York inmate had a liberty interest in remaining in a temporary release program such that he was entitled to certain process before his enrollment in the program was revoked. Post-*Sandin*, in *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999), the Second Circuit found that an inmate in a work release program while in (New York) state custody had a liberty interest in remaining in that program. The circuit court concluded that the work release program was "virtually indistinguishable" from the programs at issue in *Morrissey* and *Young*, and that the petitioner therefore had a liberty interest in remaining in the program, "the loss of which imposed a sufficiently 'serious hardship' to require compliance with at least minimal procedural due process." *Kim*, 182 F.3d at 118. And a few years later, the Second Circuit confirmed that its determination in *Tracy* survived *Sandin*, again finding that an individual in New York's temporary release program had a liberty interest in remaining in the program. *Anderson v. Recore*, 317 F.3d 194 (2nd Cir. 2003).[4] Against this legal

---

[4] *Anderson* more specifically dealt with the related, yet distinguishable, issue of whether state officials should have known that *Tracy* remained settled law such that they could not carry that qualified immunity defense. Because the ruling did not analyze a novel procedural due process claim, it is not clear to what extent *Anderson* was intended to govern subsequent due process analyses. In *Anderson*, the Second Circuit distinguished *Sandin* from *Tracy* in that *Sandin* dealt with an intra-prison disciplinary issue (and not with an individual who had been removed from the community and returned to prison), stating that "[t]he requirement that [a] deprivation be 'atypical and significant . . . in relation to the ordinary incidents of prison life' is a refinement of *Morrissey*'s grievous loss of liberty standard for the intra-prison disciplinary situation." *Anderson*, 317 F.3d at 200 (2d Cir. 2003). However, the Supreme Court has applied the

backdrop, the undersigned previously has found that BOP's home confinement program is so similar to the work release, pre-parole, and parole programs in *Kim*, *Young*, and *Morrissey*, that individuals on home confinement have a liberty interest in remaining on home confinement.  Specifically, this court has found that

> [h]ome confinement is a variation of traditional imprisonment that bears the same "essential" features as the programs at issue in *Morrissey*, *Young*, and *Kim*.  Petitioner was released from prison, before the completion of her sentence, on the condition that she abide by certain rules.  She was able to work, she was able to go to school, and she was able to reunite her family.  In sum, she enjoyed substantial liberty. The liberty of an individual on home confinement, like that of a parolee, thus "includes many of the core values of unqualified liberty," and "[i]ts termination calls for some orderly process, however informal."

*Tompkins*, 2022 WL 3212368 at *11 (quoting *Morrissey*, 408 U.S. at 482) (first alteration added).  The undersigned further found that individuals on home confinement similarly would satisfy the *Sandin* "atypical and significant hardship" test, if it were applied.  *Id.* And to date, *Tompkins* appears to be the only ruling on this specific issue in this district, though other cases have raised similar arguments.[5]  This conclusion would support a consistent outcome in the present case.

---

*Sandin* test to the denial of clemency, which does not involve intra-prison discipline.  *See Ohio Adult Parole Auth. V. Woodard*, 523 U.S. 272, 282 (1998).  Additionally, the Second Circuit has not cited to *Anderson* for this proposition since it was decided; this is true even in *Holcomb v. Lykens*, 337 F.3d 217 (2d Cir. 2003), which issued only six months after *Anderson* and which examined whether a liberty interest existed so as to allow a prisoner to remain in Vermont's extended furlough program.  Similarly, *Kim* did not explicitly rely upon the "grievous loss" test.  *Kim*, 182 F.3d at 118.  It is unclear whether or to what extent the standards ("grievous loss," "atypical and significant hardship," and "serious hardship") differ from one other.  But this court reiterates its conclusion in *Tompkins* that the circumstances of an individual on home confinement are so similar to the circumstances of an individual on parole, pre-parole, or work release as to satisfy the "grievous loss" standard (as stated in *Morrissey*), the "serious hardship" standard (the language used in *Kim*), and the "atypical and significant hardship" standard (as articulated in *Sandin*).

[5] *See Cardoza v. Pullen, No. 3:22-CV-00591 (SVN) (D. Conn.); Nicks v. Pullen, et al,* No. 3:22-CV-00925 (RNC) (D. Conn.); *Raynor v. Pullen,* No. 3:22-CV-01609 (JAM) (D. Conn.).  The court notes that *Raynor* has been dismissed as moot.  *Nicks* and *Cardoza* remain pending.

2. *Respondents' Arguments*

Conversely, the government asserts that it has refined its arguments, suggesting that a different conclusion is warranted here. Once again, Respondents argue that home confinement does not resemble the parole, pre-parole, and work release programs at issue in *Morrisey*, *Young*, and *Kim*, and that someone on home confinement is entitled to no process at all before being reincarcerated. Instead, Respondents contend that BOP may "redesignate" individuals to prison for any reason, or for no reason at all.

a) *"Redesignation"*

First, the government again points out, and the court again agrees, that federal law clearly grants BOP the sole, broad authority to decide where to house prisoners, and where to transfer them between facilities. *See* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment . . ." and may "direct the transfer of a prisoner from one penal or correctional facility to another.").[6] Similarly, courts cannot instruct BOP where to house its inmates, *see id.* ("[A] designation of a place of imprisonment under this subsection is not reviewable by any court."), and traditionally have not interfered with the administration of prisons, *see, e.g., Meachum v. Fano*, 427

---

[6] The court previously questioned the government's position that revocation of home confinement is an action taken within the broad authority of § 3621(b), since the statute specifically states that the BOP may designate prisoners to, and transfer them between, *penal and correctional facilities*, and does not indicate that an individual's private residence qualifies as such a facility. The court noted that BOP itself interprets the phrase "penal and correctional facility" to *exclude* private residences, such that it will not designate an individual to home confinement at the start of the inmate's sentence. *See* BOP Program Statement 7320.01(1); ECF No. 31-3 at 4 ("The Bureau does not have statutory authority to designate a home confinement program for an inmate at the beginning of his or her sentence. This is supported in Title 18, U.S.C., Section 3621, which requires that the Bureau designate any available penal or correctional facility as the place of a prisoner's imprisonment.") (emphasis in original). The government notes that even if a private residence is not a BOP facility within the meaning of the statute, FCI Danbury *is,* such that Petitioner's removal *to* such a facility clearly is within the BOP's authority. The court need not assess this issue, since Petitioner does not challenge BOP's authority to remove an individual to prison; the issue is what process is due *before* such removal.

U.S. 215, 228–29 (1976) (cautioning against "involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges."). Nevertheless, it is undisputable that where matters of prison administration overlap with constitutional interests, those matters are subject to judicial review. *See, e.g., Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (finding that the conditions at the Ohio State Penitentiary imposed an atypical and significant hardship within the correctional context such that they created a liberty interest); *Hudson v. McMillian*, 503 U.S. 1, 4 (1992) (reaffirming that maliciously beating prisoners is contrary to the Eighth Amendment of the Constitution); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (noting that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

Respondents again cite to several cases which they assert support their position that Petitioner's "redesignation"[7] was an action taken within the BOP's broad authority. None of these cases has precedential value, and none involves the liberty interest inquiry. *See United States v. Mize*, No. 3:12-CR-137-TAV-HBG, 2021 WL 3891062 (E.D. Tenn. Aug. 31, 2021) (granting a motion for compassionate release while mentioning the uncertainty that the movant would remain on home confinement); *Violette v. Pharos House*, No. 1:21-CV-00148-DBH, 2021 WL 3721815 (D. Me. Aug. 23, 2021), report and recommendation adopted, No. 2:21-CV-148-DBH, 2021 WL 4144740 (D. Me. Sept. 10, 2021) (assessing an alleged Fourth Amendment violation); *United States v. Statom*, No.

---

[7] Respondents again characterize Petitioner's reincarceration as a mere "redesignation," while also conceding that the action was taken in response to Petitioner's alleged misconduct, thereby rendering BOP's reincarceration action a clearly disciplinary sanction in the eyes of this court. Still, whether BOP's actions were disciplinary in nature is irrelevant as to the present liberty interest inquiry, and so reliance on such a determination is unnecessary while ruling on the instant petition.

08-20669, 2021 WL 872214 (E.D. Mich. Mar. 9, 2021) (ruling on a motion requesting home confinement).  Respondents also again cite to *Hatch v. Lappin*, 660 F. Supp. 2d 104 (D. Mass. 2009), acknowledging that the undersigned already has found it unpersuasive, *see Tompkins*, 2022 WL 3212368 at *8–*9, but asserting that they believe that it was correctly decided.  Nevertheless, Respondents fail to present any novel reasoning to suggest why *Hatch* should be deemed applicable or particularly persuasive.  Moreover, as Petitioner points out, it is not clear whether *Hatch* survived the First Circuit's finding in *Gonzalez-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010), that people in Puerto Rico's electronic supervision program (a program similar to home confinement) indeed have a liberty interest in remaining in the program.

Finally, Respondents argue that the circumstances presented here are more analogous to those presented in *Meachum*, 427 U.S. 215, where the Supreme Court found that inmates had no liberty interest in remaining at any particular prison, even when transferred to a facility with less favorable conditions.  The court disagrees.  The situation of an individual who has been released to home confinement, where they may live at home, with loved ones, and pursue employment and education, is far more similar to that of an individual on parole or pre-parole than it is to someone confined within a prison.  Similarly, the reincarceration of an individual from home confinement is far more analogous to the reincarceration of an individual on parole than it is to the transfer of an inmate from one prison to another.  And although Respondents argue that reincarceration "inarguably" is within the sentence imposed, the court reiterates its previous findings that "[c]arrying out an uninterrupted carceral sentence typically does not involve abrupt separation from one's children and employment, nor does it typically inflict the logistical

chaos of an abrupt remand from the community to physical custody," which hardships "generally accompany an arrest, but generally are not revisited during the course of a term of imprisonment." *Tompkins,* 2022 WL 3212368 at *11. Respondents' first argument therefore is unavailing.

b) *Implicit Promise*

Next, the government argues that the finding of a liberty interest relies upon the finding of an "implicit promise" that an individual on home confinement would not be returned to prison absent misconduct, and that there is no such promise on which Petitioner reasonably could have relied. The court has found that there is ample evidence from which an individual reasonably could expect not to be reincarcerated without cause. In the first instance, the express purpose of § 3624(c) is reintegration into society, so one reasonably might conclude that the BOP would not thwart Congressional intent by reimprisoning people absent good reason. Also, the agreement establishing Petitioner's conditions of home confinement does not warn that home confinement can be revoked without cause; rather, it gives certain instances in which an individual affirmatively can be removed from home confinement (such as by refusing to participate in the program, or by failing to remain at an approved residence). ECF No. 1-9; *see also Tompkins*, 2022 WL 3212368 at *7. In fact, BOP's program statement describing home confinement only mentions termination in relation to major infractions. *See* ECF No. 1-8 at 6–7. Aside from the government's response, there is no hint that individuals on home confinement may be removed from the program except by committing major infractions (and certainly not in the absence of misconduct, entirely).

14

Even then-Director of the BOP Michael Carvajal himself indicated in a 2020 address to the Senate Committee on the Judiciary that he expected those removed to home confinement pursuant to the CARES Act would remain on home confinement for the remainder of their sentences. *See* ECF No. 1-6 (declaring that BOP was screening the inmate population for individuals who would serve "the remainder of their sentences" in home confinement).  And in a December 10, 2021, memorandum from BOP general counsel Ken Hyle to Assistant Attorney General Christopher Schroeder, General Counsel Hyle indicated that individuals on home confinement only will be "transfer[red] back to secure correctional facilities if there are any significant disciplinary infractions or violations of the [home confinement] agreement."  ECF No. 1-7 at 6.  General Counsel Hyle further noted that of the 4,879 individuals who had been placed on home confinement pursuant to the CARES Act, 289 had been returned to prison for violations of the conditions of home confinement or for new crimes. *Id.* at 7–8.  It seems clear, then, that that the BOP does not employ a widespread practice of reincarcerating individuals on home confinement, and this, too, reasonably could instill an expectation that one would be permitted to continue on home confinement absent good cause for revocation.

Respondents argue that all of this is insufficient to establish an "implicit promise" of remaining on home confinement, and that instead it must arise from some statutory or regulatory authority that explicitly binds the government's authority.  The court disagrees.  First, the statute at issue in *Morrissey* allowed parolees to be taken into custody and returned to prison at any time, according to the dissent penned by Justice Douglas.  *Morrissey*, 408 U.S. at 492–93.  Nevertheless, and despite that clear statutory framework, the *Morrissey* majority found that the parolee in that case relied upon an *implicit* promise

that he would not be returned to prison absent misconduct.   Moreover, though, Respondents' position appears to be the very one from which the Supreme Court explicitly departed in *Sandin*.   There, the Court lamented that the liberty interest inquiry had become an exercise in syntactical interpretation, and it deliberately shifted jurisprudential focus *away* from the language of laws and regulations and back onto the *nature* of the deprivation in question.   *Sandin*, 515 U.S. at 483 (1995).   Any caselaw which predates *Sandin* therefore is inapposite.

Further, the court finds that the only two post-*Sandin* opinions cited by Respondents (the *Young* case, and *Holcomb v. Lykens*, 337 F.3d 217 (2d Cir. 2003)) do not carry their argument.   Respondents note that in *Young*, the Supreme Court referenced *Morrissey*'s implicit promise language "with approval."   ECF No. 14 at 12.   However, they argue that *Young* hinged on a State of Oklahoma pre-parole regulation that went into effect after the pre-parolee in that case had been returned to prison.   *See Young*, 520 U.S. at 150.   And in *Holcomb*, when the Second Circuit was tasked with determining whether Vermont's extended furlough program had created a liberty interest, it concluded that in order to rule on the question, it needed to know whether extended furlough status had to be renewed every fifteen days.   Respondents claim that these cases show regulations to be dispositive of the "implicit promise."

The gist of the government's argument on this point basically is that had circumstances been different from what actually was presented to the deciding courts, those courts would have issued decisions favorable to Respondents' position in this case. However, this court cannot accept hypotheticals as precedent.   With respect to *Holcomb*, furlough qualitatively is different from both parole and work release programs.

Fundamentally, furlough exists as a *temporary* benefit, and the Second Circuit was attempting to measure this significant distinction when it concluded that it needed to know more about the administration of the extended furlough program. *Holcomb*, 337 F.3d at 221–22 ("At this point in the inquiry, then, the question for us with respect to Holcomb's claim is whether Vermont's extended furlough is similar enough to parole as characterized by *Morrissey* and *Young* with respect to the extent and conditions of the liberty conferred to him as a furloughee to be treated as though it were parole for Fourteenth Amendment purposes."). More importantly, the circuit court did not determine whether the program created a liberty interest, and instead disposed of the appeal on other grounds. Thus, at best, *Holcomb* provides only tenuous support for Respondents' position.

As for *Young,* it is not clear whether the Supreme Court's analysis would have been different had the regulatory framework also been different, particularly given the relevant statutory framework in *Morrissey*. Moreover, it is unclear whether the Court's analysis would be different in a circumstance such as this one, where Petitioner *explicitly* was told by BOP that she would not be returned to prison absent misconduct. *See* ECF No. 15-1 at ¶¶ 33–36. Petitioner asserts that she was told both by staff at FCI Danbury and at the halfway house that she would be returned to prison only if she were to violate the terms of her release. Apparently, Petitioner was given "facially complete" terms of release, and she reasonably relied upon that promise that she would not be returned to prison without cause. *See Young*, 520 U.S. at 151 (rejecting the argument that the pre-parolee could be returned to prison if his parole were denied, pointing to the "facially complete" rules of the program, which said nothing about the effect of a parole denial). Therefore, this argument also fails.

17

Accordingly, the court again concludes that Petitioner had a liberty interest in being free from the arbitrary revocation of her home confinement.  Additionally, the court reiterates that this ruling should not be construed to mean that those on home confinement never can be returned to prison; they simply are entitled to certain process before their reimprisonment, to ensure that cause exists for such reincarceration.

### C.  Procedure Due

The undersigned already has held that before being reincarcerated, individuals on home confinement are entitled to those protections laid out by the Supreme Court in *Morrisey*, since home confinement bears such a strong resemblance to *Morrissey*'s parole program, and since each considers the same public interest concerns in assessing its revocation.[8]  The government devotes its response to arguing the nonexistence of a liberty interest, and it fails to offer any argument as to the specific process that might be due in this case.

Accordingly, this court again finds that procedural due process protections must be exercised before home confinement may be revoked; specifically, the two-step *Morrissey* process must be followed.  The first step after an alleged home confinement violation is a preliminary hearing to determine whether there is probable cause to justify the inmate's detention (before the hearing required to satisfy the second *Morrissey* step).[9]

---

[8] Specifically, the court noted that there is a strong governmental interest in being able to return an individual to secure custody without first requiring full-scale prosecution, but the court also noted that summary treatment is inappropriate in assessing the conduct of an individual not then in a prison setting, and that society itself has a stake in a parolee's rehabilitation.

[9] In cases where the alleged violation constitutes *criminal* behavior, of course the inmate already might be detained by the authority or law enforcement agency first initiating such criminal accusations.  Thus, criminal conduct used as a basis to allege a home confinement violation might first result in an inmate immediately being held in local, state, or federal custody due to imminent safety concerns related to that alleged criminality.  At the same time, alleged "technical" violations of home confinement that do not amount to new *criminal* behavior would allow the arbiter to authorize or to deny an inmate's detention pending the second phase of *Morrisey* review.

18

*Morrissey*, 408 U.S. at 485–87.  This first phase allows for an inmate's rapid detention upon a finding of mere probable cause that she violated her conditions of home confinement, but the factfinder should be an uninvolved individual who did not initiate the revocation process.  *Id.* at 485 (finding that someone "not directly involved in the case" should determine whether probable cause exists to justify an inmate's detention).  Still, the person presiding over this preliminary detention hearing need not be a judge.  *Id.* at 486.  Additionally, the preliminary hearing should be "at or reasonably near the place of the alleged [home confinement] violation or arrest" and it should take place "as promptly as convenient" after the alleged violation.  *Id.* at 485.  The inmate must be given notice as to the hearing and as to the alleged violations to be considered therein, and in most cases should have the opportunity to cross-examine adverse witnesses.  *Id.* at 487.  The inmate should have the opportunity to present evidence and defenses, and, if she chooses, to testify on her own behalf.  *Id.*  Upon ruling, the hearing officer should articulate the reasons for her decision and the evidence upon which she relied, but these need not be formal findings of fact and conclusions of law as would be expected at a final determination of whether the home confinement status should be revoked altogether.  *Id.*

If probable cause is found to justify the inmate's detention from home confinement, a revocation hearing still must be conducted before the inmate's home confinement is revoked.  *Id.*  The minimum procedural due process requirements at this second phase (revocation hearing) under *Morrissey* include (a) written notice of the alleged violations; (b) disclosure of evidence against the accused; (c) an opportunity for the accused to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and to cross-examine adverse witnesses (unless good cause exists to deny such

confrontation); (e) a "neutral and detached" hearing body; and (f) a written statement by the factfinder(s) delineating the result of the hearing, and, if home confinement is revoked, the reasons for such revocation, and the evidence relied upon in arriving at that ruling. *Id.* at 489.  The revocation hearing must take place within a reasonable period of time, but since it is more involved than the (first phase) preliminary detention hearing, reasonable delays[10] are understandable and permitted.  *Id.* at 488.  The burden of proof to be applied in revocation hearings is a preponderance of the evidence, the same burden as is applied in hearings for revocation of probation and of supervised release.  *See* 18 U.S.C § 3583(e)(3).  *See also United States v. Teran*, 98 F.3d 831, 836 (5th Cir. 1996); *United States v. Bujak*, 347 F.3d 607, 609 (6th Cir. 2003).

### D.  Right to Counsel

Petitioner makes an argument that she also is entitled to have counsel at her hearing, citing the Supreme Court's holding in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), that, under certain circumstances, a parolee or probationer may be entitled to counsel at certain revocation hearings.  The undersigned previously has noted that the applicability of *Gagnon* to home confinement revocation is not clear, given that the Supreme Court, only a few years after issuing the *Gagnon* opinion, issued *Wolff*, in which the justices stated that they were "not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings."  *Wolff*, 418 U.S. at 570.  Moreover, assistance of counsel is not included among the minimum requirements listed in *Morrissey*.  In fact, in *Morrissey*, the Court specifically avoided finding that parolees are

---

[10] The *Morrissey* court left room for judicial discretion in determining whether a revocation hearing has been held within a reasonable period of time, but it noted that a "lapse of two months" between the preliminary and revocation hearings "would not appear to be unreasonable."  *Id.* at 488.

entitled to counsel, implying that the assistance of correctional staff would suffice. *Morrissey*, 408 U.S. at 489 n.16.  Petitioner now argues that *Wolff* is distinguishable, dealing as it did with intra-carceral disciplinary hearings.

The court need not address this issue here, though, because even assuming that *Gagnon* is applicable, its holding merely was that an individual *might* have a right to counsel, as determined by the relevant administrative authority, in cases where the inmate makes a "timely and colorable claim (i) that [s]he has not committed the alleged violation of the conditions upon which [s]he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present."  *Gagnon*, 411 U.S. at 790 (1973). There is no indication in the record that either circumstance is presented here.  Petitioner does not dispute that she violated her home confinement conditions, or even that there were circumstances which either justified or excused the violation.  Rather, she argues that her reincarceration has an outsized and deleterious effect on herself and her family. This argument is neither complex nor difficult to present.  The court is sensitive to the mental health concerns Petitioner asserts make it difficult for her to advocate for herself, but despite these limitations she has managed to pursue her grievance through all levels of review, and she was able to operate within a professional and educational setting whilst on home confinement.  These facts indicate that she is able to represent her own interests at a detention or revocation hearing.  Finally, Petitioner has not provided, and the court has not found, any precedential authority that an individual is entitled to retained counsel

in a probation revocation hearing where there is no entitlement to appointed counsel, and the court is unpersuaded to find such a right here.

### E. Remedy

It appears from the undisputed facts that Petitioner never was afforded any of the process delineated above.  She had an informal conversation with a Kintock staff member at the time of the alleged violation, but then was released to her home.  A few weeks later, she was directed to return to the halfway house, but it does not appear she received even a preliminary hearing at that time.  She was not told that she was being returned to prison, and she was not provided with the basis for her reincarceration.  Even now, there is no record of who decided to reincarcerate Petitioner, nor the basis for their decision.

Petitioner seeks multiple forms of relief for Respondents' violation of her procedural due process rights.  *See* ECF 1 at 23.  She seeks her immediate release, declarations that Respondents have insufficient basis under the Due Process Clause to detain her and that her imprisonment is unlawful, an injunction against Petitioner's continued imprisonment until her due process rights have been restored, and reasonable attorneys' fees and costs.

Given the total lack of any process prior to Petitioner's reincarceration, her current imprisonment appears unlawful.  Therefore, she must be returned to home confinement under the same conditions as were imposed upon her release in December 2020, pending the BOP's compliance with the procedures described herein.

As to the requests for declaratory relief, the court declines to exercise its discretion under the DJA to do so.  *See* 28 U.S.C. § 2201(a) ("[A]ny court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of

any interested party seeking such declaration, whether or not further relief is or could be sought.") (emphasis added); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants."). Not only does the finding of a constitutional violation render any such declaration duplicative, but declaratory judgment generally should not be used to grant retrospective relief, particularly in cases where the defendant is a government entity. *See Green v. Mansour*, 474 U.S. 64, 67–68 (1985) (declining to find retrospective declaratory relief appropriate under either the Declaratory Judgement Act or the Eleventh Amendment). As to the request for an award of attorneys' fees and costs, Petitioner has not identified the fees and costs she incurred in retaining counsel from legal clinics, nor the authority in support of such a reward, if any such costs and fees indeed were incurred. The request for attorneys' costs and fees therefore is denied without prejudice to renewal.

## IV.    CONCLUSION

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. The Petition for Writ of Habeas Corpus, ECF No. 1, is **GRANTED.**

2. Given the conclusions herein, Petitioner's request for immediate enlargement is **GRANTED** pending the provision of due process in accordance with this order.

3.  Petitioner's motion for a temporary restraining order, ECF No. 16, hereby is **DENIED as moot.**

4. The court respectfully asks the Clerk of Court to close this case.

**IT IS SO ORDERED** in Hartford, Connecticut, this 2nd day of March, 2023.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE